ANTONIO CAVAGNARO *vs.* WILLIAM L. CLARK.

Suffolk.    January 13, 1898. — May 24, 1898.

Present: FIELD, C. J., ALLEN, KNOWLTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Employers' Liability Act — Due Care — Negligence of Superintendent — Law and Fact.*

In an action under the employers' liability act, St. 1887, c. 270, it appeared that the plaintiff was engaged in carrying bricks in a wheelbarrow from an elevator to masons at work on a building ; that he returned with his empty wheelbarrow for the purpose of descending with it on the elevator; that A., the defendant's superintendent, was standing on the elevator as he approached it; and that it was the custom,· when a person had so placed himself on the elevator, for any one standing near by as a signal to lower the elevator. The plaintiff testified that he asked A. if he had room to put his wheelbarrow on, and A. replied that there was not much room ; and that he put the wheelbarrow on the elevator, and had one foot on it when it started down, causing him to fall. A. testified that he jumped upon the elevator and said, " Let her go " ; that a workman who was standing near pressed the button and shouted, " Stand clear " ; that a minute or so later the elevator started down ; and that the first he knew of the plaintiff's being near was when he turned and saw him falling. *Held*, that the questions whether the plaintiff was using due care, and whether his injury was caused by the negligence of A. while exercising superintendence, were for the jury.

TORT, for personal injuries occasioned to the plaintiff while in the defendant's employ, by the alleged negligence of a person in such employ intrusted with and exercising superintendence, and whose sole or principal duty was that of superintendence. Trial in the Superior Court, before *Hardy*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff testified that he was a laborer, and in April, 1895, was working for the defendant on a building in Boston ; that he had been working on this building for two or three months prior to the accident; that on the day of the accident he was carrying bricks and mortar from the elevator to the masons at work on the walls ; that he had taken a wheelbarrow full of bricks from the elevator, which had brought it up from the basement to the floor on which he was working, had emptied the wheelbarrow and was bringing it back to the elevator ; that one Smith, the defendant's superintendent, was standing on the ele-

vator as he approached it; that the plaintiff asked Smith if he had any room on the elevator to put his wheelbarrow; that Smith replied that there was not much room on the elevator at the time; that he put the wheelbarrow on the elevator, and had one foot on the elevator when it started down with Smith on it, causing him to fall; that nobody spoke to him at that time about the elevator starting; that the usual method of starting the elevator up and down was for any one of the laborers to press the button placed near the elevator well, which rung an electric bell down below for the engineer; that the elevator was operated by steam, and the signal for moving it was to ring the bell once to go down; that when the foreman or some of the laborers went down on it, they used to ring the bell three times; that when he saw Smith on the elevator there was another man, a laborer, standing beside him; and that the plaintiff did not hear the bell rung or anything said to him.

On cross-examination, he testified that he had used this elevator more than twenty times that day before the accident; that he had worked about four weeks on work that required him to use this elevator; and that during this period he had used it every day.

On re-direct examination, the plaintiff testified that he used the elevator when he had to send the wheelbarrows down; that he did not go down on the elevator to get the bricks, but that he did go up on the elevator when he went to work in the morning, also at dinner time and in the evening when he got through work; that when he wanted to go up, he used to ask the engineer to carry him up; and that sometimes he used to ring the bell.

Patrick Connors, called as a witness by the plaintiff, testified that he was employed by the defendant as a hod carrier at the time of the accident; that just before the accident he had carried a hod off the elevator; that Smith was on the elevator and had been there about two minutes; that the witness rang the bell three times because Smith told him to " ring the bell and let him off at the second floor"; that Smith was the foreman, and just before the plaintiff fell " was bossing all of us"; and that Smith said nothing except for the witness to ring him down, and let him off at the first floor.

On cross-examination, he testified that he had worked on the building for a month or six weeks; that the plaintiff was working there when he came; that the plaintiff used the elevator in bringing his wheelbarrows up, as well as every other man; that he used to use the elevator every day, and rang the bell if it was necessary to have the elevator come down or go up; that he had seen him doing that a great many times; that all the men, including the plaintiff and himself, used the elevator to go up on in the morning and down at noon; that any man who wanted the elevator would ring this bell; that they shouted, when they rang the bell, to stand clear from under; that Smith was standing on the elevator near the witness, and the hods on the elevator were above his head so that Smith could not see through them; that the witness could not see through them, and Smith was standing "right up to him"; that Smith told him to ring the bell, and to leave him at the second floor; that he rang the bell once, and then the elevator started; and that if he had rung it again he could have stopped the elevator, but he was excited, and did not ring it because he saw the plaintiff falling.

On re-direct examination, the witness testified that after the elevator had started and after he saw the plaintiff fall, or at the moment he saw him do anything, he did not hear Smith say anything.

Jeremiah Murphy, called as a witness by the plaintiff, testified that, at the time of the accident, he was employed as a hod carrier by the defendant on the building in question, and was working on the floor underneath the floor which the plaintiff fell from, and saw the plaintiff falling as the elevator descended carrying Smith, whose head was above the hods; that he very often rang the bell to ring the elevator up and down; that every man on the floor used it to get stock up on the floor; that the signals of the bell were three bells to go down when there was a man on it, and one bell to stop it if it was going down, and two bells when there was nobody on it.

On cross-examination, he testified that he used the elevator as he came up in the morning, when he went down at noon, and at five o'clock when he stopped work, and at any other time when he needed it.

James Reardon, called as a witness by the plaintiff, testified

that, at the time of the accident, he was employed by the defendant as a hod carrier in the building in question; that he was working on the same floor that the plaintiff fell from; that the elevator was generally used to hoist up stock; that the laborers used the elevator in going to and from their work, and also through the day, riding up or down with their loads; that anybody who was near it would press the bell; that just before the accident, while Smith was standing on the elevator, the witness had put a hod on it and had walked away five or six feet; that he then turned round and saw the plaintiff falling and Smith going down in the elevator, Smith's back being turned towards the witness and away from the side of the floor on which the witness and the plaintiff had been working; and that neither just before nor at the time of the accident did he hear anything.

On cross-examination, he testified that he used the elevator morning, noontime, and evening, and sometimes through the day; that if he was next to the bell, and there was a man on the elevator, the latter would tell him to ring the bell; and that it would not make any difference whether it was Smith on the elevator or anybody else.

George H. Smith, called as a witness by the defendant, testified that he was employed as foreman by the defendant at the time of the accident, and laid out the work for the men, saw it was done properly, and kept them in stock; that he was standing in the elevator with his back towards Washington Street, and had his arm on the rack for the hods when it started down at the time of the accident; that he had no conversation with the plaintiff, who approached the elevator from the Washington Street side of the building; that the first thing he knew of the plaintiff's being near the elevator was when he turned round and saw him falling; that he saw the barrow coming just ahead of the plaintiff, but did not think it was wholly on the elevator; that the elevator stopped within two stories of the bottom, he thought; that as to calling the elevator to send it down, generally the last man who took his hod off did it, but "when they see it is all unloaded and wants to go down, the man that stands nearest to that button will send it down"; that as the witness approached the elevator, Connors was standing near the button;

and that the witness jumped on the elevator and said, " Let her go," and thereupon Connors rang three bells and shouted, " Stand clear," and a minute or so later the elevator started down.

On cross-examination, after testifying that he attempted to catch hold of the plaintiff as he fell towards the elevator, he testified, among other things, as follows : " Q. Why did n't you call to Connors, ' Stop this elevator ' ? A. Well, when that starts, you hardly have time to do anything. I did n't think, and if I had, it would n't have made any difference. — Q. And after jumping on and saying, ' Let her go,' and resting with your arm on the rack facing towards Boylston Street, you did not see the plaintiff ? A. No, I was n't facing that way. — Q. And the elevator immediately started ? A. No, sir ; it did not immediately. — Q. How long after the push button ? A. I could n't tell. It might have been a half a minute or a minute perhaps. I don't know. — Q. Or it may have been immediately ? A. I hardly think ; no, it could n't have been, not right off. — Q. Did you say ' Let her go,' before you got on the elevator or after ? A. I said ' Let her go ' before I got on ; run right to it and said ' Let her go,' and jumped on. — Q. And after you said ' Let her go,' did you look at Connors ? A. He rang the bell ; I know he was there ; I saw him. — Q. Was n't it a rather slow elevator ? A. Yes ; slow running. — Q. And when three bells were rung it went down more slowly than it did at other times ? A. Yes. — Q. Then it was going slowly ? A. Yes, sir. — Q. Did n't that give you plenty of time to yell back to Connors as soon as you saw the plaintiff, ' Stop ' ? A. Perhaps it might, but it would n't have done any good. — Q. You thought it wouldn't do any good ? A. I did n't think anything about it. All I thought of was trying to catch this man."

At the conclusion of the evidence, the defendant requested the judge to rule that, upon all the evidence, the plaintiff could not recover ; that Smith at the time of his alleged negligence was not exercising superintendence ; and that the plaintiff could not recover, even if the jury should find that Smith was negligent. The judge refused so to rule ; and the defendant excepted.

The judge instructed the jury, among other things, as follows :

" The principal question for you to consider is whether or not Smith was exercising superintendence at the time of this

accident. Now, what is it to exercise superintendence? Certain acts have to be considered, and if you find that those acts were performed by this superintendent, it would be the duty of the court to instruct you that he would be a superintendent within the meaning of the law. Now, the question is, was Smith engaged in controlling the actions of men who were in the employment of the defendant? [Was he engaged at the time of the accident in exercising control or directing the actions of the employees of the defendant? You have heard the testimony as to what he was doing just previous to the time that he entered upon the elevator. Was he then controlling the men and ordering them and directing them to do certain things by reason of their employment by the defendant and by reason of his position as superintendent? When he entered upon the elevator, it is for you to consider whether he was then directing the movements of this elevator by reason of his position as a superintendent. If you find from all these facts that he was directing the action of the fellow servants of the plaintiff at that time, and by reason of his acts he so far controlled their action that he set any dangerous machinery in motion, it is an issue on which you are to pass, whether or not he was acting in controlling and directing the movements of this machinery at the time. If you find that he was controlling the action of these fellow employees and directing them, it would be your duty to find that he was exercising an act of superintendence at that time.]

" The next question is whether or not he was acting as a fellow servant of the plaintiff. A man may be a superintendent with reference to controlling men in the same common employment with the plaintiff, and in other instances he may be simply a fellow servant. For instance, if you should find on all the facts here that he simply went on to that elevator the same as any other servant in the employment of the defendant, and simply went on there to ride down the elevator without any act of control on his part, it would be your duty to find that he was acting simply as a fellow servant. For instance, if he should get on there and should not act in any such way as to order the elevator to be moved by reason of the fact that he was acting as superintendent, that would be the act of a fellow servant. It is for you to consider whether when he went down that elevator

he was acting as a fellow servant, or whether he did exercise any control which would be that of a superintendent in directing the movements of the elevator. If you find he did not exercise any control as a superintendent in directing its movements, his action would be that of a fellow servant, and you would have to find for the defendant."

The defendant excepted to that portion of the charge enclosed in brackets.

The jury returned a verdict for the plaintiff ; and the defendant alleged exceptions.

*J. Lowell*, for the defendant.

*J. R. Murphy*, for the plaintiff.

BARKER, J.  1. Whether the plaintiff was guilty of contributory negligence was a question for the jury. The evidence would warrant a finding that when he attempted to put his wheelbarrow upon the elevator platform, the platform was standing at the level of the floor, and that its descent had not yet begun. Assuming that he knew that the superintendent who stood on the platform had placed himself there to be lowered with the platform, and that it was the custom when any person so placed himself on the platform for any one standing near to press the button as a signal for the engineer below to lower the platform, and that there was always an interval between the pressing of the button and the beginning of the descent, so that the signal to lower might have been given before the plaintiff came with his wheelbarrow, he testified that he asked Smith, the superintendent, if he had room to put his wheelbarrow on, and that Smith replied that there was not much room. From this reply the jury could find that the plaintiff understood the superintendent to assent that the plaintiff should put the wheelbarrow on, and that the plaintiff could reasonably infer that he could safely proceed, especially if he had not heard the previous warning to " stand clear."

2. It was also a question for the jury whether the plaintiff's injury was due to the negligence of a " person in the service of the employer, intrusted with and exercising superintendence," within the meaning of St. 1887, c. 270, § 1, cl. 2.  So far as appears, the sole duty of this superintendent was that of superin-

tendence, and in riding upon the elevator from the floor of the building on which he stood to a lower floor he was acting in the service of his employer. He testified that he jumped upon the elevator and said, "Let her go," and that thereupon a workman who was standing near the button, rang three bells and shouted, "Stand clear," and that a minute or so later the elevator started down, and that the first he knew of the plaintiff's being near was when he turned and saw the plaintiff falling. The order, "Let her go," was itself an act of direction or oversight, tending to control others, and to vary their situation or action because of his direction. *Cashman* v. *Chase*, 156 Mass. 342. Having given the order, and seen that it was followed by the signal the giving of which would cause the elevator to descend, it would be his duty to countermand his order and to take means to prevent the elevator from going down, if after the giving of the signal he had reason to suppose that another person was about to attempt to put a wheelbarrow upon the platform, and that he had such reason might be found from the plaintiff's testimony. This duty of countermanding the order which he had given, or of taking some means to prevent the injury of a workman whom he knew was about to put himself in danger by doing an act which would have been safe but for the fact that the elevator was about to go down, was itself a duty of superintendence, a duty to perform an act of direction or oversight tending to control others, and which his position as superintendent required him to give, and made it negligence in his work of superintendency not to give. *McCauley* v. *Norcross*, 155 Mass. 584.

If he had been merely an ordinary fellow workman with the plaintiff, the acts which he did and those which he ought to have done, both in ordering that the elevator should be sent down, and in ordering that the signal to lower should be countermanded, or in ordering the plaintiff not to proceed when he found that the plaintiff was about to put on his wheelbarrow, would have been in effect acts of superintendence. In that case the defendant would not have been liable for these acts of superintendence, because they were not acts of any person intrusted with and exercising superintendence, whose sole or principal duty was that of superintendence, and the employer is not made answerable by the statute for acts of superintendence negligently performed in

his service by an ordinary workman, or by one who is both workman and superintendent, in making declarations which may be interpreted either as orders of a superintendent or as assurances of a fellow workman, if in fact they are merely such assurances. *Whittaker* v. *Bent*, 167 Mass. 588.

In the present case the superintendent had no other duty than that of superintendency, and when he negligently gave orders, or negligently omitted to give them when required by his position, his employer is answerable. In the opinion of a majority of the court the entry should be,    *Exceptions overruled.*